1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF HAWAII

3
     UNITED STATES OF AMERICA,        ) CR 17-00109LEK
4                                     )
                    Plaintiff,        ) Honolulu, Hawaii
5                                     ) November 15, 2017
        vs.                           )
6                                     ) MOTION HEARING – EVIDENTIARY
     MICHAEL PHILLIP PATRAKIS,        )
7                                     )
                    Defendant.        )
8    _____)

9
                         TRANSCRIPT OF PROCEEDINGS
10              BEFORE THE HONORABLE LESLIE E. KOBAYASHI
                      UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Government:        JILL OTAKE, AUSA
                                DARREN W.K. CHING, AUSA
14                              Office of the United States Attorney
                                PJKK Federal Building
15                              300 Ala Moana Boulevard, Suite 6100
                                Honolulu, Hawaii 96850
16
     For the Defendant:         KEITH S. SHIGETOMI, ESQ.
17                              711 Kapiolani Boulevard, Suite 1440
                                Honolulu, Hawaii 96813
18

19

20

21
     Official Court Reporter:  Debra Read, CRR RMR RDR
22                             United States District Court
                               300 Ala Moana Boulevard
23                             Honolulu, Hawaii 96850
                               readit3949@gmail.com
24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).

                         UNITED STATES DISTRICT COURT

1                          I N D E X

2              CHRONOLOGICAL INDEX OF WITNESSES

3

4   GOVERNMENT'S WITNESSES                              PAGE

5


6   **SHARLOTTE BIRD**
      Direct Examination By Ms. Otake                     5
7     Cross-Examination By Mr. Shigetomi                 21
      Redirect Examination By Ms. Otake                  35
8
    **JASON FOXWORTHY**
9     Direct Examination By Ms. Otake                    36
      Cross-Examination By Mr. Shigetomi                 54
10    Redirect Examination By Ms. Otake                  74

11  DEFENDANT'S WITNESSES                               PAGE

12
    **MICHAEL PHILLIP PATRAKIS**
13    Direct Examination By Mr. Shigetomi                76
      Cross-Examination By Ms. Otake                     78

14

15

16

17

18

19

20

21

22

23

24

25

3

1                        I N D E X

2                     E X H I B I T S

3
                                      FOR              FOR
4                               IDENTIFICATION      EVIDENCE
     NO.                             PG.              PG.
5    _____

6    1                               7                7
     2                               7                8
7    3                              17               17
     4                              18               18
8    5                              51               51

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  WEDNESDAY, NOVEMBER 15, 2017                          9:03 A.M.

2          THE COURTROOM MANAGER:  Criminal 17-109 LEK, United

3  States of America versus Defendant Michael Phillip Patrakis.

4      This case has been called for a motion to suppress.

5      Counsel, your appearances for the record, please.

6          MS. OTAKE:  Good morning, Your Honor.

7      Jill Otake, Darren Ching for the United States.  With us

8  is Bruce Law of HSI.

9          THE COURT:  All right.  Good morning to all of you.

10     Mr. Shigetomi.

11         MR. SHIGETOMI:  Good morning, Your Honor.

12     Keith Shigetomi along with Michael Patrakis.

13         THE COURT:  All right.  Good morning, Mr. Patrakis.

14  The record will reflect your presence.  And good morning to all

15  of you.

16     All right.  So we're here on the government's motion.  I

17  do have the exhibits and the witness list, and happy to hear

18  the evidence.  I'm particularly interested in the issue of

19  the -- a reasonable expectation of privacy with regard to

20  access to the -- to the website information, that is, the

21  accessing by the person who reported it to the police and

22  showed them the video on the -- Ms. Rutowski -- in terms of her

23  access.

24     And secondly, with regard to the government's apparent

25  authority argument, in other words, how were they to know that

1    she had unauthorized access as argued by Mr. Patrakis?  So

2    those are two particular things that I'm interested in.

3         Obviously you know the facts and issues better than I do,

4    so I don't mean to limit you to those, but in reading through

5    your submissions and the law, those are the two particular

6    areas that I have questions about.

7         All right.  So, Ms. Otake?  Mr. Ching?

8         MS. OTAKE:  Yes, Your Honor.  Just one point of

9    clarification.  We do intend to call both Detective Bird and

10   Officer Foxworthy today.  We are going to cover additional

11   exhibits that are -- well, we're going to cover all five

12   exhibits listed on our exhibit list today.

13        THE COURT:  All right.  Very good.

14        MS. OTAKE:  Thank you.  Our first witness is

15   Detective Sharlotte Bird.

16        THE COURT:  Okay.

17   **SHARLOTTE BIRD, GOVERNMENT'S WITNESS, WAS SWORN**

18        THE WITNESS:  My name is Sharlotte Bird.  First name

19   is S-h-a-r-l-o-t-t-e.  Last name is B-i-r-d.

20                    DIRECT EXAMINATION

21   BY MS. OTAKE:

22   Q    Good morning, ma'am.

23   A    Good morning.

24   Q    What do you do for a living?

25   A    I'm a police officer employed by the Hawaii Police

1    Department.

2         Q     How long have you worked for the Hawaii Police

3    Department?

4         A     Seventeen years.

5         Q     What is your current title?

6         A     I'm currently a detective.

7         Q     How long have you served as a detective?

8         A     Ten years.

9         Q     In the course of those ten years, what sorts of

10   cases have you investigated?

11        A     I have investigated a variety of cases to include

12   financial crimes, property crimes, death, sexual crimes, crimes

13   involving juveniles.

14        Q     To which unit are you currently assigned?

15        A     I'm currently assigned to the Sex Crimes Unit in the

16   Juvenile Aid Section.

17        Q     Were you the lead Hawaii County detective assigned

18   to the Patrakis investigation in September 2015?

19        A     Yes.

20        Q     And in the course of that investigation, did you

21   have the opportunity to confer with Officers Foxworthy and

22   Fukumoto?

23        A     Yes, I did.

24        Q     Did you draft an affidavit in support of a search

25   warrant of Mr. Patrakis's house searching for digital devices?

UNITED STATES DISTRICT COURT

```
 1         A      Yes, I did.

 2         Q      I'll ask the clerk if she could show you Exhibit 1.

 3                (Exhibit 1 previously marked for identification.)

 4         Q      (BY MS. OTAKE:)  Thank you.  Could you tell us what

 5    Exhibit 1 is?

 6         A      Exhibit 1 is a copy of the search warrant I drafted,

 7    Search Warrant No. 2015-132K.

 8         Q      Does it include your affidavit in support of the

 9    search warrant?

10         A      Yes, it does.

11         Q      Does that affidavit accurately reflect what Officers

12    Foxworthy and Fukumoto told you about Ms. Rutowski as well as

13    your own interactions with Mrs. Rutowski?

14         A      Yes.

15                MS. OTAKE:  Your Honor, the government offers

16    Exhibit 1 which is also attached as Exhibit 1 to our initial

17    response to this case.

18                THE COURT:  All right.  Any objection?

19                MR. SHIGETOMI:  No, Your Honor.

20                THE COURT:  Received.

21                (Exhibit 1 received into evidence.)

22         Q      (BY MS. OTAKE:)  And also if you could look at

23    Exhibit 2, please.

24                (Exhibit 2 previously marked for identification.)

25         Q      (BY MS. OTAKE:)  What is Exhibit 2?
```

UNITED STATES DISTRICT COURT

1          A      Exhibit 2 is the Search Warrant Return I filed for

2    Search Warrant No. 2015-132K.

3          Q      Does that Return accurately reflect the items that

4    were seized in the course of the execution of the search

5    warrant in this case?

6          A      Yes.

7                 MS. OTAKE:  Your Honor, government offers Exhibit 2

8    which was attached as Exhibit 2 to our pleading as well,

9    although the order of pages is slightly different.

10                THE COURT:  All right.  Any objection,

11   Mr. Shigetomi?

12                MR. SHIGETOMI:  No, Your Honor.

13                THE COURT:  All right.  Received.

14                (Exhibit 2 received into evidence.)

15         Q      (BY MS. OTAKE:)  I'd like to turn your attention

16   then to what Officer Foxworthy had advised you of regarding his

17   interaction with Jessie Rutowski on September 17th

18   approximately 3:00 A.M.

19                What was it that Officer Foxworthy told you about

20   his interaction and specifically what Ms. Rutowski told him?

21         A      Well, he told me that he was called to meet with

22   Jessie Rutowski --

23                MR. SHIGETOMI:  Your Honor, I just want to object

24   and at least understand that we're objecting to the truth of

25   the matter, but not the fact that that's what she was told.

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  All right.  Understood.  And you're not
 2    offering for the truth of the matter, but just what she did in
 3    response to information she perceived?
 4              MS. OTAKE:  Yes, for the purposes of the apparent
 5    authority argument.
 6              THE COURT:  All right.  So the objection's overruled
 7    on that basis.
 8              MS. OTAKE:  Thank you.
 9              THE COURT:  Thank you.
10              THE WITNESS:  Officer Foxworthy told me that he met
11    with Jessie Rutowski on the side of the road.  She showed him
12    some video clips that were disturbing to her and that's what
13    she wanted to report.  She told Officer Foxworthy that she was
14    given permission to access a video surveillance system account
15    that belonged to Michael Patrakis and that she was given
16    permission by Mr. Patrakis to access that account.  He had
17    given her the user name and password to the account.
18       Q      (BY MS. OTAKE:)  Did she explain to
19    Officer Foxworthy when it was that she was first given the
20    information of the password and the user name?
21       A      She told Officer Foxworthy that a person by the name
22    of Nate had stolen some cameras.  These would be the
23    surveillance cameras for his system.
24       Q      For whose system?
25       A      For Mr. Patrakis's surveillance system, and that
```

```
 1    Mr. Patrakis called her -- or asked her for help.

 2         Q     On which date?

 3         A     I can't recall exactly what date at this time.

 4         Q     Would it help you to refresh your memory if you were

 5    able to look at the affidavit, that is Exhibit 1?

 6         A     Yes, yes.

 7         Q     Did that refresh your recollection?

 8         A     Yes.

 9         Q     And on what date did she indicate to

10    Officer Foxworthy was it that Mr. Patrakis contacted her?

11         A     She said Mr. Patrakis contacted her on

12    September 12th, 2015.

13         Q     What did she tell Officer Foxworthy about what this

14    person Nate had said to Mr. Patrakis?

15         A     She told Officer Foxworthy that Nate accused him of

16    being a pedophile and said that he was going to make sure he

17    spends time in jail.

18         Q     You testified that she related that Mr. Patrakis

19    called her for assistance.  Did she explain to

20    Officer Foxworthy what happened after he asked her for

21    assistance?

22         A     She said that she accessed Mr. Patrakis's

23    surveillance system account and that's when she made her

24    observations of the videos.

25         Q     And you testified that he had given her the password
```

UNITED STATES DISTRICT COURT

1   and user name.  Did she indicate whether or not he had wanted

2   her to look at the videos?

3        A    She indicated that he wanted her assistance.

4        Q    Okay.  And did she, in fact -- did she tell you what

5   date it was that she accessed the account?

6        A    That would have been September 16th, 2015.

7        Q    You said that she did access the videos and then

8   reported it.  To whom did she make the initial report?  Would

9   that first report, in-person report, been to Officer Foxworthy?

10       A    Yes.

11       Q    Okay.  Did you yourself meet with Ms. Rutowski on

12  any occasion?

13       A    Yes, I did.

14       Q    And how many times did you meet with her during that

15  first few days of being assigned the case?

16       A    Say approximately two times.

17       Q    What was the date of the first meeting with her?

18       A    I first met with Ms. Rutowski somewhere on

19  September 17, 2015.  That was about 10:20 in the morning.

20       Q    What was the purpose of that meeting?

21       A    The purpose was to get clarification on what she was

22  reporting.  I didn't understand what the Dropcam system was and

23  how it worked.

24       Q    Prior to meeting with her on that date, did you run

25  any checks on who she was?

UNITED STATES DISTRICT COURT

```
 1      A      Yes.  I did check our Hawaii Police Department
 2  Records Management System.  I put her name into the system.
 3      Q      What did you learn after checking her name in the
 4  system?
 5      A      I learned that I didn't see any felony-type crimes
 6  associated to her name or any type of crimes that would give me
 7  reason not to believe what she was saying.
 8      Q      Did she meet you at the police station or somewhere
 9  else?
10      A      She met me at the police station.
11      Q      How did she know to meet you there?
12      A      I can't recall whether or not I contacted her or
13  Officer Foxworthy contacted her, but one of us contacted her.
14      Q      Was she ordered to come in or was it a request to
15  come in?
16      A      It was a request.
17      Q      Which police station did you meet at?
18      A      The Kona police station.  It's also known as the
19  Kealakehe police station.
20      Q      Where in the police station did you meet?
21      A      In an interview room.
22      Q      And does Exhibit 1, the affidavit, accurately
23  describe what occurred during that meeting with her?
24      A      Yes.
25      Q      If you could go over a few of those points.  What
```

1    did she tell you when you met with her at the police station?

2         A     She told me that she was given permission to access

3    Mr. Patrakis's Dropcam account.  She informed me that the video

4    surveillance footage saves to a cloud, so it's not saved to an

5    actual device within the home.  She said it can be accessed

6    through the Dropcam website or an app that you can download on

7    your phone.

8         Q     Was she familiar with whether or not the system

9    saves the videos for a particular length of time?

10        A     Yes.

11        Q     What did she tell you about that?

12        A     She told me that the videos only save the video

13   footage for ten days and then it would delete from the system.

14        Q     Did she explain to you anything about the nature of

15   her relationship with Mr. Patrakis, for example, how she knew

16   him?  Whether or not she had lived with him?

17        A     She told me that she used to be his roommate and she

18   moved out earlier that year in January.

19        Q     And would this have been in the same residence for

20   which you were seeking a search warrant at that point?

21        A     Yes, on Kumu Place.

22        Q     What did she tell you about how the Dropcam video

23   surveillance system was first installed in the residence?

24        A     Well, she told me that she had an ex-roommate that

25   left behind the Dropcam camera and that she had given that

1    Dropcam camera to Mr. Patrakis, and then Mr. Patrakis purchased

2    more cameras after that.  She also said that she helped him

3    install those cameras.

4         Q     What did she tell you about how it was that

5    Mr. Patrakis first contacted her regarding this Nate person?

6         A     She told me that Nate stole his cameras and he

7    trusted -- or Mr. Patrakis trusted Ms. Rutowski and she felt

8    like he thought of her as his voice of reason.

9         Q     What did she do when Mr. Patrakis told her that Nate

10   had stolen the cameras and accused him of being a pedophile?

11        A     She asked him for his account information.

12        Q     Did she say why?

13        A     She wanted to help him.

14        Q     Okay.  Did she indicate at all what she planned on

15   doing with that information to assist him?

16        A     I don't recall her saying exactly what she planned

17   to do.

18        Q     Okay.  Did she say that he willingly gave her that

19   information?

20        A     Yes.

21        Q     Okay.  And did she relate to you the same thing that

22   she related to Officer Foxworthy, that she accessed the system

23   a few days later?

24        A     Yes.

25        Q     After she told you this information, did she show

```
 1   you any videos while at the police station?

 2       A     Yes, she did.

 3       Q     How did she do that?

 4       A     She used her phone.

 5       Q     Did she -- were you able to tell from where you were

 6   whether or not she had to log into an account to access these

 7   videos that she showed you on her phone, or were they already

 8   on her phone in some fashion?

 9       A     She pulled it up on her phone.  I wasn't sure at

10   that point how she pulled it up on her phone.

11       Q     Okay.  After -- did you have an opportunity then to

12   watch the videos on her phone?

13       A     Yes.

14       Q     What did you do after you saw the videos on her

15   phone?

16       A     I took some photographs of the videos she was

17   showing me on her phone.

18       Q     And what did you do after that?

19       A     I did look for a laptop computer because I wanted to

20   bring the computer into the interview room, reason being was

21   Ms. Rutowski's phone was small and couldn't hear very good.

22   She offered to play it -- the video on a different device.  I

23   wasn't able to locate a laptop computer.

24       Q     What did you do then?

25       A     I did provide her access to a computer, a desktop
```

UNITED STATES DISTRICT COURT

1    computer in my office.

2        Q      What happened once she reached your desktop

3    computer?  Were you with her the entire time?

4        A      I was there, yes.

5        Q      What did you see her do?

6        A      I saw her log in -- well, she logged into the

7    account.  I didn't see how -- what she put into the computer,

8    but she logged into an account and was able to pull up video.

9        Q      Could you tell that it was more than just clicking

10   on an icon, for example?  And could you tell that she had to

11   actually input information?

12       A      Yes, she was logged in -- or went to a website first

13   and then she typed information in.

14       Q      From that did she then show you the same videos she

15   had shown you on the phone?

16       A      Yes.

17       Q      What did you do with those videos?

18       A      I -- while Ms. Rutowski was showing me the video --

19   it's basically one video -- she offered to download the video,

20   so she did.  She downloaded a video and I recovered that.  I

21   placed it onto a CD and submitted that as evidence.

22       Q      Do you have that CD with you today?

23       A      Yes.

24       Q      Is it marked as Exhibit 3?

25       A      Yes, it is.

UNITED STATES DISTRICT COURT

1              (Exhibit 3 previously marked for identification.)

2        Q     Okay.  And if you could look at it for a moment.

3              How are you able to tell that that is a copy of the

4    CD that you transferred the download onto?

5        A     I was able to view it this morning.

6              MS. OTAKE:  Your Honor, government offers Exhibit 3

7    under seal.

8              THE COURT:  Any objection?

9              MR. SHIGETOMI:  No, Your Honor.

10             THE COURT:  All right.  Received.

11        (Exhibit 3 received into evidence under seal.)

12       Q     (BY MS. OTAKE:)  At some point did you also at the

13   end of that day provide Ms. Rutowski with any other media such

14   as a disc or a thumb drive or a diskette?

15       A     Yes, I did.

16       Q     Can you explain to the Court why you did that and

17   what you told Ms. Rutowski about that thumb drive?

18       A     Well, when she was downloading the video, it took a

19   while, so she offered to download the videos at a later time

20   and I provided her with a thumb drive to do that.

21       Q     Was that a blank thumb drive at the time you gave it

22   to her?

23       A     Yes.

24       Q     Whose thumb drive was it?

25       A     That was my thumb drive.

1    Q    Can you explain to the Court what happened with that

2  thumb drive?

3    A    Ms. Rutowski left the police station with the thumb

4  drive and contacted me the following morning.  I met with her

5  the following morning on September 18th, 2015, about 9 o'clock,

6  and recovered the thumb drive from her.

7    Q    Do you have Exhibit 4 with you?

8    A    Yes, I do.

9         (Exhibit 4 previously marked for identification.)

10   Q    (BY MS. OTAKE:)  Could you explain to the Court what

11  Exhibit 4 is?

12   A    Exhibit 4 is a copy of the videos from the thumb

13  drive that I recovered under our chain of custody form receipt

14  No. 17.

15        MS. OTAKE:  Your Honor, government offers Exhibit 4

16  under seal.

17        THE COURT:  All right.  Any objection?

18        MR. SHIGETOMI:  No, Your Honor.

19        THE COURT:  Exhibit 4 is received.

20     (Exhibit 4 received into evidence under seal.)

21   Q    (BY MS. OTAKE:)  And to clarify, at the point at

22  which you retrieved Exhibit 4 from Ms. Rutowski, had a search

23  warrant already been signed, the search warrant that's

24  listed -- that's shown in Exhibit 1?

25   A    Yes.

1      Q      Had it been executed yet?

2      A      No.

3      Q      I have a few final general questions,

4    Detective Bird.  Did you offer Jessie Rutowski anything in

5    exchange for the information she provided you?

6      A      No, I did not.

7      Q      Did she -- did you give her anything in exchange for

8    the information she provided you?

9      A      No, I did not.

10      Q      To the best of your knowledge, is everything that

11    you included in Exhibits 1 and 2 true and accurate?

12      A      Yes.

13      Q      Did it appear to you that Ms. Rutowski's access to

14    the Dropcam system and specifically Mr. Patrakis's account was

15    limited in any way?

16      A      No.

17      Q      Okay.  At any point did you direct her in either of

18    your two meetings regarding what to show you during those

19    meetings?

20      A      No.

21      Q      So she chose how to access the accounts and which

22    items to show you; is that correct?

23      A      Yes.

24      Q      Why did you believe that had permission to access

25    the account?

1      A      I had no reason to disbelieve her.  Her background

2  didn't indicate that she had a history of lying.  I didn't know

3  her prior to this.  She seemed like she was very concerned for

4  the two-year-old that was in the video.

5            MS. OTAKE:  If I may have a moment, Your Honor?

6            THE COURT:  Uh-huh, you may.

7      Q      (BY MS. OTAKE:)  At some point, Detective Bird, did

8  you find out whether or not Mr. Patrakis had actually filed a

9  police report regarding the theft of his video cameras by this

10  person named Nate?

11      A      Yes.

12      Q      When in the sequence of events did you learn that he

13  had in fact filed a police report?

14      A      It was sometime between 7:45 A.M. on September 17th

15  and around 9:15 A.M.  I received my assignment at 7:45 in the

16  morning and I wasn't able to meet with the officers until about

17  9:15 in the morning.

18      Q      So before you even learned about the details that

19  Ms. Rutowski had given and before you had even met with her in

20  person, you had already known that Mr. Patrakis had reported

21  these cameras stolen?

22      A      Yes.

23            MS. OTAKE:  Okay.  Thank you.  I have no further

24  questions.

25            THE COURT:  All right.  Thank you.

UNITED STATES DISTRICT COURT

1          Detective, may I ask you a question?  With regard to

2     Ms. Rutowski, did you ask her if Mr. Patrakis gave her

3     permission to access the account?

4               THE WITNESS:  Yes.  She told me she was given

5     permission.

6               THE COURT:  So you specifically asked her as opposed

7     to her telling you?

8               THE WITNESS:  Yes.

9               THE COURT:  Okay.  Thank you.  All right.

10         Mr. Shigetomi, your witness.

11                         CROSS-EXAMINATION

12    BY MR. SHIGETOMI:

13         Q    Good morning.

14         A    Good morning.

15         Q    Detective, what time did you actually get the

16    assignment to assist in the investigation?

17         A    It was around 7:45 in the morning on September 17th.

18         Q    Okay.  So this was after the entry of Mr. Patrakis's

19    residence by the police?

20         A    I believe so.

21         Q    Okay.  Were you at the residence at the time that

22    the other members of the Hawaii County Police Department

23    entered Mr. Patrakis's residence?

24         A    I was not present at his residence.

25         Q    Okay.  And the -- you referred to the Exhibit 1

1   which is the search warrant 2015-132K.  Remember that?

2       A    Yes.

3       Q    Okay.  And this, you said, is the search warrant

4   that you prepared and had issued by the court in Kona; is that

5   correct?

6       A    Yes.

7       Q    And the search warrant, which is government's

8   Exhibit 1, is signed by Judge Masunaga on September 18th, 2015;

9   is that correct?

10      A    That's correct.

11      Q    Okay.  So the -- at the time of the initial police

12  entry there was no warrant, correct?

13      A    That's correct.

14      Q    And at the time that you met with Jessie Rutowski on

15  September 17th, 2015, there was no warrant either, correct?

16      A    Not at that time.

17      Q    Do you recall what time the warrant was actually

18  signed by Judge Masunaga?

19      A    I can't recall.  I'd have to refer to the warrant.

20      Q    I'm sorry?

21      A    I cannot recall the time.  I'd have to refer to the

22  warrant.

23      Q    I'm sorry.  Refer to what?

24      A    The warrant.

25      Q    The warrant?

1       A       Yes.

2       Q       Okay.  Can you take a look at Exhibit 1?

3               Okay.  By looking at Exhibit 1, are you able to

4    determine what time the judge actually signed the warrant on

5    September 18th, 20:15?

6       A       Yes.

7       Q       What time?

8       A       8:34 A.M.

9       Q       And how are you able to determine that?

10      A       She placed the date and time on the warrant.

11      Q       Okay.  So when you first -- okay.  Let's go back.

12              You are assigned about 7:45 in the morning on

13   September 17th, correct?

14      A       Yes.

15      Q       Okay.  And what is your initial activity in terms of

16   the investigation?

17      A       Usually when I first get an assignment, I try and

18   find out who's involved, who's reporting it to us, who's -- who

19   the accused person is, if there's any witnesses.  I try and

20   find out that information just so I can get a start on my

21   investigation.

22      Q       Now, you told us that you did do a background -- a

23   check of the records, anyway, regarding to Ms. Rutowski,

24   correct?

25      A       Yes.

UNITED STATES DISTRICT COURT

1      Q      And you said that there wasn't any felony

2  convictions.  But were there any kind of convictions?

3      A      I didn't see anything about convictions.  In our

4  system I didn't show any felonies attached to her name, so this

5  isn't like a criminal history background.  If she had any

6  contacts with our police department, it would show in our

7  system.

8      Q      So when you say police contacts, it could be an

9  arrest?  It could be making a report?

10     A      Yes.

11     Q      Okay.  And were there any police contacts?

12     A      She did have contacts -- I can't recall what they

13  were -- but I did not see any felony-type things against her.

14     Q      Okay.  When you say contacts, was this in the

15  context of making a report or being the subject of a report, do

16  you recall?

17     A      I recall seeing she was a victim of something.

18     Q      Uh-huh.

19     A      But I don't recall seeing -- I don't recall what

20  else I saw at this time.

21     Q      Now, the information that -- well, let me ask you.

22            At that point in time you had already received

23  certain amount of information from the initial officers; is

24  that right?

25     A      Usually it comes through -- in this case the patrol

1    officers responded to the house.  The patrol officer usually

2    contacts their supervisor who in turn contacts my supervisor,

3    and then I get the assignment from there.

4         Q     Okay.  I guess what I'm asking you is did you ever

5    talk with Officers Foxworthy or Fukumoto that day?

6         A     That day, yes.

7         Q     Okay.  And when was that?

8         A     About around 9:00 A.M., 9:15 A.M.

9         Q     And they also prepared reports; is that right?

10        A     That's correct.

11        Q     And you were able to review those reports?

12        A     Yes.

13        Q     So what's your understanding as to when this report

14   to the initial officers are made?

15        A     I don't understand your question.

16        Q     What time is the report made to the police by

17   Ms. Rutowski?

18        A     I recall looking -- there's something called a

19   chronology, and I believe she initially contacted our police

20   dispatch on September 16th, 2015.  I don't recall what time.

21        Q     Okay.  So when you say you recall seeing that, would

22   that mean that a call was made by her?

23        A     She contacted our police dispatch requesting an

24   officer meet with her.

25        Q     Okay.  And do you recall when the officer actually

1   met with her?

2        A     It was September 17th, 2015, about 3:00 A.M.

3        Q     So the initial officers, Foxworthy and Fukumoto,

4   they meet with Ms. Rutowski at about 3:00 A.M.; is that right?

5        A     That's correct.

6        Q     Okay.  Are you aware of when the actual entry into

7   Mr. Patrakis's residence was?

8        A     I believe it was that same day, September 17, 2015,

9   around 7:45, around that time.

10        Q     Around that time?

11        A     I can't recall the exact time.

12        Q     And when the police made that entry into

13   Mr. Patrakis's residence, he was arrested, correct?

14        A     That's correct.

15        Q     And he was arrested shortly after the entry; is that

16   right?

17        A     That's correct.

18        Q     And when the police made that entry, they were able

19   to make visual observations as to what they saw, obviously, in

20   the residence, correct?

21        A     Yes.

22        Q     And that's related to you?

23        A     Yes.

24        Q     And that information is also contained in the

25   affidavit to the search warrant which is Exhibit 1 in evidence;

1   is that right?

2        A     Yes.

3        Q     Okay.  So as part of your support for the issuance

4   of the search warrant, you include police observation of the

5   residence; is that right?

6        A     Yes.

7        Q     Now, you told us that you later met with

8   Ms. Rutowski at about 10:20 at -- on the 17th of September 2015

9   at the police station; is that right?

10       A     Yes.

11       Q     Do you know if she was transported there or she just

12   met you guys there?  Or do you know how that occurred?

13       A     I don't know how she got there.

14       Q     Okay.  Were you introduced to her by another police

15   officer?

16       A     I can't recall.

17       Q     But in any event, obviously you do identify yourself

18   and your role in the investigation; is that right?

19       A     Yes.

20       Q     She told you that she was -- when I say she, I'm

21   talking about Jessie Rutowski -- Jessie Rutowski told you that

22   she was a roommate of Michael Patrakis?

23       A     Yes.

24       Q     And that she had since moved out?

25       A     Yes.

```
 1        Q      Did you ask her if she had been in a romantic

 2   relationship with him?

 3        A      I don't recall if I asked her that or not.

 4        Q      Okay.  There's nothing like that indicated in any of

 5   your reports, correct?

 6        A      No, not that I saw.

 7        Q      Okay.  And so would it be fair to say if you don't

 8   recall that, you don't recall whether or not you asked if she

 9   had any type of problem or grievance or bad feelings towards

10   Mr. Patrakis as a result of any type of problem in a

11   relationship of some sort?

12        A      I don't recall asking her that.

13        Q      Obviously you did get a chance to look at the

14   videos?

15        A      Yes.

16        Q      And they were disturbing to you?

17        A      I saw videos.

18        Q      Huh?

19        A      I saw the videos.

20        Q      Well, the videos themselves also provided a basis

21   for you to get the search warrant, correct?

22        A      Yes.

23        Q      Did you think to yourself when you saw the videos

24   why would someone give someone permission -- another person

25   permission to access that kind of videos?
```

1     A     I did initially.

2     Q     Did you ask her?

3     A     Well, she told me that Mr. Patrakis trusted her and

4     wanted her help and that's why he gave her the permission.

5     Q     Okay.  But that thought did arise in your mind?

6     A     I did think it, yes.

7     Q     Okay.  Did Jessie Rutowski seem eager to assist the

8     police in this?

9     A     She was cooperative.

10    Q     What's the difference to you?

11    A     Well, she wanted to make sure the two-year-old was

12    safe, so she wanted to do what she -- she wanted to give us the

13    information to make sure the two-year-old was safe.

14    Q     But she did offer all this information to you,

15    correct?

16    A     Yes.

17    Q     The initial offering of the information to the

18    police back at about 3 o'clock in the morning on the 17th,

19    correct?

20    A     Yes.

21    Q     And then she came to the police station willingly,

22    correct?

23    A     Yes.

24    Q     And she met with you willingly, correct?

25    A     Yes.

UNITED STATES DISTRICT COURT

1      Q      And she was the one who was showing you videos on

2    the telephone, correct?

3      A      Yes.

4      Q      Did you ask her to do that or did she just do that?

5      A      No, she just did that.

6      Q      She just did that.  And you told us that because the

7    screen was small, screen on the telephone, it made viewing the

8    videos a little difficult, right?

9      A      That's correct.

10     Q      So in order to further assist the police, she

11   offered to use a computer?

12     A      Correct.

13     Q      So it was her offer or was it your offer?

14     A      I offered to provide her with the computer.

15     Q      Okay.  So --

16     A      But I couldn't find one.

17     Q      What's the first offer?  Is it, "I can show you on

18   another computer"?  Or can -- you asking, "Can I -- can you

19   show me on another computer"?

20     A      I can't recall exactly.

21     Q      Okay.  But nevertheless, you make an attempt to get

22   a police computer, correct?

23     A      Yes.

24     Q      And you're unable to get the laptop, right?

25     A      Correct.

1       Q       So now you offer to let her use the police computer,

2    your desktop computer?

3       A       A desktop computer yes.

4       Q       And that is police property?

5       A       Yes.

6       Q       And it's part of the police system?  When I say

7    system, I'm talking about access to the internet, all that type

8    of thing?

9       A       It does have access to the internet.

10      Q       So using the police computer, Jessie Rutowski's able

11   to show you additional videos; is that right?

12      A       She showed me the same videos she was showing me in

13   the interview room.

14      Q       So she's giving you a better view of the video then?

15   How's that?

16      A       Yes.

17      Q       Now, you said that that is downloaded, correct?

18      A       Yes.

19      Q       By her?

20      A       Yes.

21      Q       Is that at your request or --

22      A       No.

23      Q       -- I mean, you're recovering it as evidence, right?

24      A       Yes.

25      Q       So it's at your request?

UNITED STATES DISTRICT COURT

32

```
 1        A       It was not at my request.

 2        Q       So she said, "I'll download it for you"?

 3        A       Yes.

 4        Q       But you accept it?

 5        A       Yes.

 6        Q       And on that date and time was there only one video

 7   that was recovered by you?

 8        A       Yes.

 9        Q       And, obviously, you said that you took photographs

10   of the cell phone video, but in terms of the actual video

11   itself, that's the only one that's recovered?

12        A       Yes.

13        Q       So then there's now this discussion about retrieving

14   other evidence, correct?

15        A       Other videos, yes.

16        Q       Which is going to be evidence, right?

17        A       Eventually, yes.

18        Q       So who -- obviously you're interested, correct?  I

19   mean, to further your investigation?

20        A       I'm interested, yes.

21        Q       In terms of the conversation as to Jessie Rutowski

22   saying, "I'll do it for you," or you asking her, "Can you do it

23   for me?" do you recall the conversation?

24        A       I don't recall the exact conversation, but I did not

25   ask her to do it for me.
```

1        Q      Okay.  But there is an agreement?

2        A      Yes.

3        Q      And you accept -- if there was an offer by her, you

4   accept it?

5        A      Yes.

6        Q      And in order to facilitate your acceptance, you

7   provide her with a thumb drive?

8        A      Yes.

9        Q      With the express intent and purpose of getting more

10  videos, correct?

11       A      She offered to provide more videos.  I provided her

12  with the thumb drive.

13       Q      I understand that.  But that's the intent --

14       A      Yeah.

15       Q      -- of that providing of the thumb drive, correct?

16       A      I wanted to make sure she had something to put the

17  videos on.

18       Q      It wasn't for you -- for her to provide you anything

19  other than videos that she could download from Michael

20  Patrakis's account, correct?

21       A      That's correct.

22       Q      Now, you had told us that -- well, back up.

23              So the search warrant that is government's

24  Exhibit 1, that was not in effect or had not been issued when

25  you had this meeting with Ms. Rutowski on September 17th,

1   correct?

2        A    That's correct.

3        Q    And later on, you said the next day, Ms. Rutowski

4   eventually provides you with the thumb drive, correct?

5        A    Yes.

6        Q    And you're able to review the contents of the thumb

7   drive?

8        A    Yes.

9        Q    There are additional videos?

10       A    Yes.

11       Q    And you recovered that as evidence as well, correct?

12       A    Yes.

13       Q    Now, you were asked -- well, the search warrant --

14   the search warrant, you said, was signed by Judge Masunaga

15   September 18th, 2015, at about 8:35, right?

16       A    8:34, yes.

17       Q    Okay.  8:34.  And the search warrant wasn't to

18   search his system; it was to search his house, correct?

19       A    That's correct.

20       Q    So it wasn't that -- the search warrant didn't

21   pertain to anything other than to retrieve articles of evidence

22   from Mr. Patrakis's residence, correct?

23       A    Correct.

24       Q    So that really wasn't -- the obtaining of that thumb

25   drive really wasn't encompassed within the warrant, correct?

```
 1         A      Correct.

 2         Q      So, you know, when Ms. Rutowski comes back to you on

 3    September 18th, obviously about 24 hours has passed since you

 4    last met with her, correct?

 5         A      Yes.

 6         Q      And you said that that question in your mind, well,

 7    you know, why would somebody allow another person access to

 8    this type of information, did you follow-up on that question in

 9    any way to investigate?

10         A      She had already told me --

11         Q      I understand that.

12         A      -- why.

13         Q      But did you do anything more?

14         A      I don't understand your question.

15         Q      Well, did you do anything more to try to answer that

16    question for yourself other than her initial response?

17         A      No.

18                MR. SHIGETOMI:  I have no other questions, Your

19    Honor.

20                THE COURT:  All right.  Thank you.

21          Any further questions, Ms. Otake?

22                MS. OTAKE:  Just one, Your Honor.

23                          REDIRECT EXAMINATION

24    BY MS. OTAKE:

25         Q      Detective Bird, was anything in terms of evidence
```

UNITED STATES DISTRICT COURT

1    taken or seized at the time the officers first entered the

2    Patrakis household?

3         A    No.

4              MS. OTAKE:  Thank you.  I have no further questions.

5              THE COURT:  All right.  Thank you very much.

6    Detective.  You are excused as a witness.  Thank you.  And

7    please don't discuss your testimony with anyone until after

8    this matter's been ruled on.

9         Ms. Otake, any other witnesses?

10             MS. OTAKE:  Yes, Your Honor.  The government calls

11   Officer Jason Foxworthy.

12        **JASON FOXWORTHY, GOVERNMENT'S WITNESS, WAS SWORN**

13             THE COURTROOM MANAGER:  Please have a seat.

14        State your name for the record and spell your first and

15   last name.

16             THE WITNESS:  My name is Jason Foxworthy, J-a-s-o-n,

17   F-o-x-w-o-r-t-h-y.

18                           DIRECT EXAMINATION

19   BY MS. OTAKE:

20        Q    Sir, is that your usual voice?

21        A    No.  I lost my voice.  I have a cold.

22        Q    Okay.  How are you feeling?

23        A    I'm sick.

24        Q    Okay.  What do you do for a living?

25        A    I'm a police officer for Hawaii County Police

 1   Department.

 2        Q     How long have you been a police officer with Hawaii

 3   County Police Department?

 4        A     Nine years and three months.

 5        Q     What is your current role in the police department?

 6        A     I am a Police Officer II in Kona patrol.  I'm a

 7   patrol officer.

 8        Q     Do you have any college degrees?

 9        A     I do.

10        Q     What is your college degree in?

11        A     I have a bachelor's in English literature and

12   philosophy, a double major.

13        Q     From where?

14        A     UH Hilo.

15        Q     Sir, were you on duty on September 17th of 2015?

16        A     I was.

17        Q     Who were you working with at that point?

18        A     My beat partner was Officer Christopher Fukumoto.

19        Q     When you say "beat partner," are you folks together

20   in the same car?

21        A     No, but we work in the same area, Kona District.

22   It's separated into two different parts.

23        Q     How big is the part of the Kona District in which

24   you work?

25        A     It's from Honalo area all the way to Manuka State

1    Park.  It's a pretty large area.  I don't know the exact square

2    miles.

3         Q    And you say it's broken up into two parts.  What are

4    the two parts?

5         A    Mauka and makai.

6         Q    What section were you working that night?

7         A    Mauka.

8         Q    How many other folks were on duty with you that

9    night of September 17th -- or I should say the early morning

10   hours of September 17th, 2015?

11        A    I'm not hundred percent.  I know the minimum

12   strength for the shift is eight, so most likely at least six

13   other patrol officers in addition to my supervisors.

14        Q    So is Mr. -- or Officer Fukumoto your partner?

15        A    Yes.

16        Q    Okay.  At around 3:11 A.M. that morning, what

17   happened?

18        A    I was assigned by Central Dispatch, police dispatch,

19   to respond to a lady who wanted to hand over video

20   surveillance, show it to officers, of child abuse and neglect.

21        Q    Did you meet with that woman?

22        A    Yes.

23        Q    What was her name?

24        A    Jessie Rutowski.

25        Q    Where did you meet with her?

1      A      On the side of the road on Hawaii 180, or Mamalahoa

2  Highway -- sorry -- Mamalahoa Highway and Kaleilei Street.

3      Q      Why did you meet her there?

4      A      She told me that she had -- she lived in a driveway

5  with multiple houses, shared driveway, and she didn't want to

6  disturb her neighbors.

7      Q      When you met with her, what did she tell you?

8      A      She told me she had received video surveillance from

9  her friend, Michael Patrakis.  His surveillance cameras had

10  been stolen and he was worried about what could be observed and

11  asked her to help him by viewing the surveillance.  So she

12  showed me on her iPhone home video surveillance of Michael

13  Patrakis.

14      Q      Let's take a few things step by step.

15             Did she tell you when it was that she was contacted

16  by Mr. Patrakis needing her help?

17      A      I think it was around the 12th.  I'm not sure the

18  exact date, but it was prior to the date that she called.

19      Q      That would be the 12th of September?

20      A      Yes.

21      Q      What did he tell her specifically about why he

22  needed her help?

23      A      He told her that the cameras had been stolen and

24  that -- by his roommate Nathan Alu, and Nathan Alu told Michael

25  that he was going to the cops and say that he was a pedophile.

1       Q       Based on what she told you, did you get the

2   impression that the theft of the cameras was related to the

3   pedophilia accusation?

4       A       Based on what she told me, I believed that there

5   possibly could be video evidence on the camera.

6       Q       Did she say how Mr. Patrakis seemed to be acting

7   when she talked to him on September 12th?

8       A       He was concerned about the cameras being stolen.

9       Q       Did she tell you why it was that Mr. Patrakis

10  reached out to her in particular?

11      A       Yes.

12      Q       What did she say?

13      A       She said that she was one of his few responsible

14  friends, that she had recently helped him with something to do

15  with his divorce, so she believed herself to be someone he

16  trusted.

17      Q       Did she tell you how specifically then she was able

18  to access the videos that she showed you?

19      A       She said that he gave her the information willingly

20  and then she told him she was going to change the information

21  so nobody but her could access it.  That's what she told me.

22      Q       Access the -- access what?

23      A       The video surveillance Dropcam had a cloud, so the

24  information from the surveillance cameras were saved to a cloud

25  account instead of physically on the cameras.

```
 1        Q      Okay.  So did she actually obtain a password from
 2   Mr. Patrakis?
 3        A      That's what she told me, yes.
 4        Q      Did she ask him for it or did he give it to her
 5   voluntarily, according to her?
 6        A      I don't recall.
 7        Q      Okay.  Did she indicate whether or not she had told
 8   him she was going to change the password?
 9        A      She told me that she had told him.
10        Q      That she was going to change it?
11        A      Yes.
12        Q      Okay.  Did she indicate whether or not he agreed to
13   her changing the password?
14        A      Yes.  She said that he was okay with it.
15        Q      Did you ask her specifically, "Did he give you
16   permission to access these videos?"
17        A      I don't recall.
18        Q      Did she tell you that?
19        A      She -- everything that I know is what she told me.
20   She kind of just gave me the back story so -- 'cause I asked
21   her how could she get all these videos to someone's home
22   surveillance, and that was her explanation.
23        Q      Was that he had given her the password?
24        A      Yes.
25        Q      Did she specifically say, "He gave me permission to
```

UNITED STATES DISTRICT COURT

 1    look at the videos"?

 2         A     She said that he wanted her to make sure that there

 3    was nothing that could hurt him.

 4         Q     On the videos?

 5         A     On the videos, yeah.

 6         Q     Did you have any prior knowledge of Dropcam prior to

 7    meeting with her that early morning?

 8         A     I did.

 9         Q     Can you tell us what your prior knowledge was of

10    Dropcam when you first met with her?

11         A     My knowledge was pretty rudimentary.  I lived in the

12    police barracks at the time and one of my roommates had Dropcam

13    at his home, so he explained the system to me because he liked

14    it.

15         Q     Okay.  Did you -- what did you know specifically

16    about Dropcam when you met with her?

17         A     That it saved to a cloud.

18         Q     Did she tell you when it was that she eventually

19    accessed the system and watched the videos that she showed you?

20         A     I believe she told me it was the -- a few hours

21    before.  I don't remember if it was the same day 'cause it was

22    3:00 A.M. when I met with her, or the day prior, but it was

23    relatively a short time before she said she watched it for a

24    while and then became bothered, and that's why she reported it

25    at 3:00 in the morning.

1      Q      Did she -- you mentioned that she showed videos to

2  you at the side of the road.  Can you describe for the Court

3  kind of the surroundings in the area where you watched these

4  videos?

5      A      Yes.  So it was dark, it was 3:00 in the morning,

6  and Kaleilei and Mamalahoa Highway intersection is a 2-way

7  road, kind of rural, not city, and there was no one on the

8  road, it was empty.  And it was probably within 20, 30 feet of

9  the roadway.  We were on the shoulder of the roadway looking at

10  her cell phone.

11      Q      How big was her screen approximately?

12      A      It was an older model iPhone, so it wasn't as big as

13  the new smartphones are.  It was a relatively small screen.

14      Q      Were you able to see what was in the videos?

15      A      Yes.

16      Q      What sort of vision do you have?

17      A      I have 20/20 vision.

18      Q      Could you describe to the Court what you saw in the

19  videos?

20      A      Yes.  I -- I saw adult male.  I saw two juvenile

21  children, males, under the age of 10, they appeared to be, and

22  I saw a baby female looked to be between 1 and 2 years old.

23  During the -- I watched numerous clips over the span of four

24  different days as Rutowski skipped around showing me the videos

25  that she thought disturbing.

UNITED STATES DISTRICT COURT

1      Q      When you say "over the span of four different days,"
2   is that the span of time it took you to look at these videos,
3   or is that the span of time that the videos covered?

4      A      The time of span that the videos covered.  I
5   probably viewed the video for about 30 minutes to an hour, and
6   mostly because the bandwidth in that area was really slow.
7   It's almost a dead spot for cell signal.  So the videos which
8   were coming from the internet were really slow to load and to
9   play.

10     Q      Could you describe for us what you saw the different
11  people in the videos doing?

12     A      Yes.  I saw the adult male hurting and taking
13  photographs of a naked little baby who appeared to be 1 to
14  2 years old.

15     Q      As you're watching these videos, is Ms. Rutowski
16  identifying for you who the people are in the videos?

17     A      She named everyone in the videos, stating that she
18  was familiar with all of the people, and that she used to live
19  with Michael Patrakis and so as such she was familiar with all
20  the people in the video.

21     Q      So let's use their names when describing them --

22     A      Okay.

23     Q      -- just for clarification.

24            You said that you saw an adult male hurting a 1- or
25  2-year-old child?

```
 1      A      Yes.

 2      Q      Who's the adult male that she described to you?

 3      A      Michael Patrakis.

 4      Q      And who was the 1- or 2-year-old?

 5      A      Anabella Evans.

 6      Q      And if we could just use her initials.

 7      A      Okay.  A.E.

 8      Q      Does she also go by A.M.?

 9      A      That's her -- M is her mom's maiden name.

10      Q      Okay.  When you say you saw in the video Patrakis

11  hurting A.E., what was he doing?

12      A      Uhm, he was being rough with her.  He was touching

13  her in what appeared to be inappropriate -- touching her breast

14  area, her butt area.  He was taking photographs, and he was

15  throwing her around on the bed and pushing down on her.

16      Q      Was she clothed when he was taking photographs in

17  these videos?

18      A      Sometimes she was naked, sometimes she had a diaper

19  on, and sometimes she had a dress that at points the dress was

20  hiked up exposing her.

21      Q      Exposing her what?

22      A      Her genitalia and her butt.

23      Q      Did you see him do anything with a Nerf-type toy?

24      A      Yes.

25      Q      Could you describe that to the Court?
```

UNITED STATES DISTRICT COURT

1      A      He took a Nerf either bow and arrow or crossbow and

2   was shooting her in the face and she was crying.  He shot her

3   multiple times.

4      Q      In the video did he stop while she was crying?

5      A      No, he kept doing it.

6      Q      You said that he was taking pictures of her at times

7   when she was naked.  Could you tell based on the video what

8   part of her body he was taking pictures of?

9      A      The camera was right in front of her genitalia and

10   her breasts.

11      Q      Can you tell us what you saw happening with the two

12   males you described under the age of 10, and if you could tell

13   us without using their names who they are in relation to

14   Mr. Patrakis.

15      A      Michael Patrakis's biological sons.

16      Q      And in the video, what did you see them doing?

17      A      They were choking and hitting and kissing and

18   fondling her.

19      Q      Fondling who?  A.E.?

20      A      A.E. multiple times on different dates.

21      Q      Did you ever see any adult or I should say older

22   females in the video?

23      A      Uhm, at one point there was an unknown blond lady

24   who came in and then left, and at another point there was a

25   Juvenile Female who is A.E.'s mother.  Her initials would be

 1  J.M.

 2      Q     And what did you see J.M. do in one of the videos?

 3      A      In one of the videos I saw the little girl, A.E.,

 4  trying to escape and was crying, and J.M. shoved her into the

 5  room with Michael Patrakis.  A.E. was trying to run away and

 6  escape the room, and she put her in a couple times and then

 7  shoved her down and shut the door quickly before A.E. could

 8  escape.

 9      Q     You said that the time span of these videos covered

10  about four days.  What dates, approximately, did these cover?

11      A      To the best of my memory, it was around

12  September 7th to September 11th or 12th, 2015, all different

13  times of day.

14      Q     What did you do upon seeing these videos?

15      A      I contacted my supervisor and told him what was

16  going on, and that recommended we take the children into

17  protective custody for their immediate safety.

18      Q      Prior to that occasion, had you ever previously

19  taken children into protective custody for their safety?

20      A      Yes, many times I have done that.

21      Q      And what did your supervisor decide after consulting

22  with your supervisor?

23      A      He told me to call Child Welfare Services and

24  explain what I had and to coordinate with them so that they can

25  be present when we go to the house.

```
 1        Q     Did you in fact do that?

 2        A     Yes.

 3        Q     And did you in fact go to the house in the video?

 4        A     Yes.

 5        Q     How did you figure out where it was?

 6        A     Jessie Rutowski told me where the house was.

 7        Q     And did it turn out that she was correct, that that

 8   was the correct house?

 9        A     Yes.

10        Q     What time did you arrive at the house?

11        A     I'm not sure the exact time, but it was on -- at

12   about 7:00 in the morning, between 7:00 and 8:00 in the

13   morning.

14        Q     On which date?

15        A     17th.

16        Q     So within a few hours after first meeting --

17        A     Yes.

18        Q     -- Ms. Rutowski?  Did you in fact enter the house?

19        A     Yes.

20        Q     Were you -- in the course of entering the house,

21   were you able to secure A.E. and take her out of the house?

22        A     Yes.

23        Q     Did you seize anything, any items of evidence in the

24   house on that occasion?

25        A     No, I didn't take any evidence from the house.
```

UNITED STATES DISTRICT COURT

```
 1        Q      I'm going to to turn your attention now to

 2   September 18th of 2017[sic].  Did you have an opportunity on

 3   that date to meet with Ms. Rutowski again?

 4        A      Yes.

 5        Q      How did you have that opportunity?

 6        A      Detective Sharlotte Bird had been working the case

 7   all day and she was finished, but she said that she hadn't been

 8   shown everything from Jessie Rutowski; she still had more stuff

 9   she wanted to show to us.  And so she asked if I can meet with

10   Jessie Rutowski at the Captain Cook police station when I

11   started.  I was working overnight shift that day -- that month,

12   so I met with her during either -- sometime between 2300 and

13   7:30 in the morning, which is my shift.

14        Q      So that would have been the 17th into the 18th?

15        A      Yes.

16        Q      And did Ms. Rutowski just show up there or how did

17   she get there?

18        A      I think she met me at the station.  I actually can't

19   remember for sure.

20        Q      Did you have any conversation with Ms. Rutowski

21   arranging the time to meet or anything of that sort?

22        A      I'm sorry.  Can you please repeat that?

23        Q      Did you have any conversation with Ms. Rutowski

24   arranging the time to meet, or did she just know a certain time

25   to show up?
```

1        A      I don't remember if it was me or Detective Bird who

2    set it up.

3        Q      What happened once you got to the Captain Cook

4    substation?

5        A      Once -- the reason why we met there is because she

6    didn't have a computer of her own to show us.  So I sat with

7    her and allowed her to use our internet so that she could show

8    me what she wanted to show me.

9        Q      What did you see her do?

10       A      She logged into an account for a Dropcam and then

11   began looking at the videos.

12       Q      What did she do at that point?

13       A      She showed me which videos she thought were of

14   interest in the criminal sense and pointed them out and played

15   them.

16       Q      Did you direct her to pull up any specific videos in

17   the course of that meeting?

18       A      To the best that I can recall, I told her to just

19   show me what she thinks constitutes a crime.

20       Q      Okay.  What happened after she pulled up the videos

21   that she wanted to show you?

22       A      After she pulled them up, I saved them to a data CD

23   so that they wouldn't be lost.

24       Q      Okay.  Do you have in front of you Exhibit 5?

25       A      Yes.

```
 1                    (Exhibit 5 previously marked for identification.)

 2          Q      (BY MS. OTAKE:)  Can you tell us what Exhibit 5 is?

 3          A      Exhibit -- sorry.  Exhibit 5 are the videos that she

 4   pointed out to me, and then I typed the description for each

 5   video file and I burned them to a data CD.  This is a duplicate

 6   copy that I viewed and it accurately represents the data that I

 7   recovered that date with Jessie Rutowski.

 8                  MS. OTAKE:  Your Honor, government offers Exhibit

 9   No. 5 under seal.

10                  THE COURT:  Any objection, Mr. Shigetomi?

11                  MR. SHIGETOMI:  No, Your Honor.

12                  THE COURT:  Received.

13               (Exhibit 5 received into evidence under seal.)

14          Q      (BY MS. OTAKE:)  Did you at any point order

15   Ms. Rutowski to do anything in this case?

16          A      Not that I can recall.  Most of it was her wanting

17   to come to us and report what she thought was happening.

18          Q      At any point did you offer her anything in exchange

19   for the info -- information she was providing you?

20          A      No.

21          Q      Did she -- did you give her anything in exchange for

22   the information she was providing you?

23          A      No.

24          Q      At some point did you become aware of whether or not

25   Mr. Patrakis had reported his cameras stolen?
```

1      A      Yes.

2      Q      When did you discover that?

3      A      I don't remember if it was between -- if it was with

4  Jessie initially.  She did tell me that the cameras were

5  stolen, so I did know that right away.  But I don't know if it

6  was at that point that I was aware a police report was made or

7  later when I went to the station before meeting with Child

8  Welfare Services I looked up the case that had been made.  So

9  some -- sometime between 3:00 and 7:00 on the 17th.

10     Q      In the morning?

11     A      Yes.

12     Q      Why did you believe she had permission to access the

13 Dropcam account?

14     A      I believe that she had permission because I don't

15 know how she could have gotten the user name and password

16 without permission, especially when she doesn't live there.

17     Q      What appeared to motivate her?  In other words, did

18 she suggest to you that she had had any falling out with

19 Mr. Patrakis of any sort or anything of that nature?

20     A      No.  She seemed to be concerned for the children,

21 A.E. and J.M.

22     Q      Did she indicate to you what her relationship with

23 was A.E. and J.M.?

24     A      She said she used to live in the house with them and

25 she was just concerned.  I think acquaintance or friend.

UNITED STATES DISTRICT COURT

1          MS. OTAKE:  If I may have a moment, Your Honor?

2          Q     (BY MS. OTAKE:)  Did she tell you anything about

3     Mr. Patrakis's opinion of her?

4          A     No -- I'm sorry.  She did tell me that he thought

5     her to be a responsible friend, someone that he could turn to

6     for help.  That's what she told me.

7          MS. OTAKE:  Thank you.  I have no further questions.

8          THE COURT:  All right.  Just a clarification,

9     Ms. Otake, I believe you said this, but I just want to make

10    sure the record's clear.  Exhibit 5 is received under seal.

11         MS. OTAKE:  Yes, please.

12         THE COURT:  All right.  Thank you.  We're going to

13    need to take a recess, our hardworking court reporter.  So I

14    was thinking this would be a good time to do so, Mr. Shigetomi.

15         MR. SHIGETOMI:  That's fine, Your Honor.

16         THE COURT:  So we're going to be in recess for

17    approximately 15 minutes and then we'll resume.  All right.

18    Thank you very much.

19         And help yourself to water, if you need it.

20         All right.  We're in recess.

21         (A recess was taken.)

22         THE COURT:  Okay.  The record will reflect the

23    presence of Mr. Patrakis and counsel, and the witness is on the

24    stand.

25         All right.  Your witness, Mr. Shigetomi.

UNITED STATES DISTRICT COURT

1          MR. SHIGETOMI:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. SHIGETOMI:

4          Q     Good morning, Officer.

5          A     Good morning, sir.

6          Q     So on September 17th, 2015, you're assigned by

7    dispatch to meet with a woman who wants to provide information

8    to the police; is that correct?

9          A     Yes.

10         Q     And both you and Officer Fukumoto respond and meet

11   with who turns -- person who turns out to be Jesse Rutowski,

12   correct?

13         A     Yes.

14         Q     This is approximately at 3:11 in the morning; is

15   that right?

16         A     Yes.

17         Q     Can you describe her demeanor when you met with her?

18         A     She was upset about the videos that she had watched.

19   She'd been watching them for a couple hours before she called

20   us.  She was upset about them.

21         Q     Did you ask her for any background information when

22   you met with her?

23         A     Yes.

24         Q     What kind of information did you ask for?

25         A     Well, we get a lot of calls sometimes didn't really

UNITED STATES DISTRICT COURT

1    happen, like people are just not mentally all there.

2         Q    I'm sorry.  What was that?

3         A    In police work we get a lot of calls when people

4    mentally are not all there.  So it was a weird thing to report

5    at 3:00 in the morning, so I was trying to determine if there

6    was anything prior to her showing the videos.

7         Q    Okay.  So, obviously, when you receive these types

8    of calls, you're somewhat wary?  Is that what you're saying?

9         A    Yes.

10        Q    All right.  And so in particular, the type of call

11   that you got, or the report from dispatch --

12        A    Yes.

13        Q    Okay.  And the other thing that you, I guess, raises

14   your -- raises some questions in your mind is the time of day;

15   is that right?

16        A    Yes.

17        Q    So do you -- when do you get the call from dispatch?

18        A    What time of day?

19        Q    Yeah.

20        A    Around 3:00 in the morning.

21        Q    So dispatch informs you and Officer Fukumoto at

22   about 3:00 in the morning that there's a woman who needs to

23   meet -- or wants to meet with police to make a report; is that

24   right?

25        A    About video surveillance, yeah.  I think it was --

UNITED STATES DISTRICT COURT

1    had individual surveillance about wrongdoing against a kid,

2    about abuse, neglect, that kind of thing.

3         Q    So actually in terms of response time, you and

4    Officer Fukumoto responded fairly quickly then?

5         A    There was no traffic, yeah.

6         Q    And you met with her on the side of the road,

7    correct?

8         A    Yes.

9         Q    Which adds to the unusualness, would you say?

10        A    Yes.

11        Q    Were able to view the driveway that was shared?

12        A    I did -- she didn't -- we weren't in front of her

13   driveway.  I wasn't able to see the driveway from where we

14   were.  She more picked an intersection to meet at rather than

15   being right by.  Her house was down the road, but couldn't see

16   it.

17        Q    Okay.  So you weren't even in front of the house?

18        A    No.  We were at the intersection of the street.

19        Q    And you said that she appeared concerned?

20        A    Yes.

21        Q    Any other appearance that you recall?

22        A    Not that I can recall at this time.

23        Q    Okay.  How about her speech?  Was she coherent?

24        A    Yes.

25        Q    The intersection that you met, was there any

1   illumination?

2        A      I don't recall if there was a street light or not.

3   If there was, it wasn't very good illumination.  We had our

4   flashlights out.

5        Q      So when you meet with Ms. Rutowski, she informs you

6   that she has this video that she wants to show you, correct?

7        A      Yes.

8        Q      Do you ask her -- sorry -- do you ask her -- does

9   she show you the video immediately or do you ask her some

10  information before you ask her to show you the video?

11       A      I don't recall if I asked her first or while we were

12  watching it.  I don't recall the order.

13       Q      But at some point in time she informs you about a

14  theft of cameras that Mr. Patrakis reports to her, correct?

15       A      Yes.

16       Q      And at that stage, do you do any investigation to

17  corroborate that or anything about that theft report?

18       A      I didn't --

19       Q      Not at that time?

20       A      Not at that time.

21       Q      Okay.

22       A      I was trying to discern the information she was

23  providing with me before looking into that other thing.

24       Q      So any information that she gave you at that point

25  in time -- this is the 3:00 A.M. encounter -- is just accepted

1    by you and not investigated at that point in time; is that

2    right?

3           A      Sir, can you please repeat that?

4           Q      Okay.  She's giving you details as to how she comes

5    into the information, correct?

6           A      Uh-huh.

7           Q      And at that point in time you don't investigate the

8    details; you're just accepting and trying to get the

9    information?  Is that correct?

10          A      I was investigating, but I was trying -- she was

11   giving me a lot of information, so I was trying to wrap my head

12   around all the information.  She was pretty much talking fast

13   and showing me all these videos, and I was trying to -- there

14   was a lot to take in.  So it's not that I wasn't investigating,

15   per se.  I just didn't look into the prior case that was

16   already made because that -- another officer had already done

17   that.

18          Q      Well, when you say you're investigating, you're

19   simply accepting the information that she's providing to you,

20   correct, and viewing the videos?

21          A      Well, by investigating, I mean I was looking at the

22   videos.

23          Q      Sure.  That's what I meant.  She's not giving you

24   information; you're going out trying to corroborate anything?

25   You're just looking at the videos?

UNITED STATES DISTRICT COURT

1      A      Correct.  I wasn't doing anything at that point,

2  correct.  Sorry.  I didn't understand.

3      Q      No problem.  So, obviously, you have an opportunity

4  to view the videos, correct?

5      A      Yes.

6      Q      And they alarm you?

7      A      Yes.

8      Q      Now, at that point in time you told us after viewing

9  the videos, you notify your supervisor, correct?

10     A      Yes.

11     Q      And your supervisor, meaning you have a sergeant?

12     A      Yeah, a patrol sergeant.

13     Q      Okay.  Who's your patrol sergeant?

14     A      Sergeant Rawlin Ravara.

15     Q      You report to him, "Sergeant, I have just viewed

16  these videos.  I have concern about the safety about some

17  minors," correct?

18     A      Yes.

19     Q      And was there I guess a procedure or protocol that's

20  followed in that type of situation?

21     A      When there's imminent danger to the children, we

22  contact CWS to take the kids into protective custody.

23     Q      Okay.  When you say CWS, you're talking about Child

24  Welfare Services?

25     A      Yes.

1    Q    Okay.  And he advises you to follow that procedure?

2    A    Yes.

3    Q    And do you do that?

4    A    Yes.

5    Q    You contact the Child Welfare Service representative

6    in Honolulu; is that right?

7    A    The intake.  So we contact the 800 number intake for

8    Child Welfare Services, and they in turn call a worker from our

9    island to meet with us and call us.

10   Q    And is that contact that you make with the intake

11   office at about 4:15 in the morning?

12   A    Approximately.  I don't remember the exact time, but

13   it was after 3:00.

14   Q    Okay.

15   A    Before 7:00.

16   Q    But according to your report about 4:15 in the

17   morning, correct?

18   A    That sounds to be right.

19   Q    Okay.  So you make the report to Honolulu, and then

20   they inform you that -- a person to contact on Hawaii Island?

21   A    Yes.

22   Q    And do you do that?

23   A    Yes.

24   Q    And was that with Kerry Perez?

25   A    Yes.

```
 1       Q      Do you actually speak with Ms. Perez?

 2       A      I don't remember if -- I think two people might have

 3  come.  I'm not a hundred percent.  I either spoke with the

 4  other person or Kerry.

 5       Q      I'm sorry?

 6       A      Two people could have possibly come 'cause there was

 7  four children we were going to try and get.

 8       Q      No, I'm asking you before that happens, do you

 9  actually speak with her?

10       A      Before we met we spoke.

11       Q      And arrangements are made?

12       A      Yes, to meet --

13       Q      And the arrangement that's made is to meet at the

14  Kona police station at about 6:15 in the morning, correct?

15       A      Correct.

16       Q      Now, once you have -- you -- obviously you told us

17  you met with perhaps two members from the Child Welfare

18  Services, correct?

19       A      At least one, yes.

20       Q      The procedure when a child is taken into protective

21  custody, the child is taken in by Child Welfare Service, not by

22  the police, correct?

23       A      That's not correct.

24       Q      I'm sorry?

25       A      Sometimes the police take them first.
```

UNITED STATES DISTRICT COURT

```
 1      Q      Okay.  But what I'm -- I guess I worded the question

 2   poorly.  Is that -- in terms of the actual custody itself, it's

 3   given over to Child Welfare Services?

 4      A      Yes.  We only initially take -- we remove them and

 5   then immediately give them over.

 6      Q      Right.  I mean, you don't hold onto them?

 7      A      We don't hold onto the children.

 8      Q      Okay.  So once you have met with these

 9   representatives from Child Welfare, the police organize that

10   they're going to go over to Mr. Patrakis's residence to further

11   investigate, correct?

12      A      Yes, to get the children.

13      Q      Yeah.  Further investigate, correct?

14      A      Correct.

15      Q      And when we're talking about Mr. Patrakis's

16   residence, is that 76-6174 Kumu Place?

17      A      I know it was on Kumu Place.  I'm not a hundred

18   percent on the address.

19      Q      Sure, okay.  But you noted it down in your report?

20      A      Yes, I did note it in my report.

21      Q      Okay.  How many police officers went to what you

22   believe to be Mr. Patrakis's residence?

23      A      I don't recall how many.  I know for sure at least

24   four.

25      Q      Well, you know there was yourself and
```

 1   Officer Fukumoto, correct?

 2        A     I know there was also Officer Jami Harper,

 3   Officer Dustin Chaves.  There could have been more, but I

 4   remember those four for sure.

 5        Q     So how -- what happens when the police get to that

 6   residence?

 7        A     I knock on the door and J.M. answers the door.

 8        Q     When you say "J.M.," you're talking about a female?

 9        A     The Juvenile Female, mother of A.E.

10        Q     And when the door's open, the police enter, correct?

11        A     I tell her that I'm here to make sure the kids are

12   okay because we found some disturbing information, and we walk

13   past her and go get A.E.

14        Q     Now, at that point in time the police did not have a

15   warrant of any sort, correct?

16        A     That is correct.

17        Q     Did you make any attempt to obtain a warrant?

18        A     Due to the exigency, we were going to get the

19   children for their safety; they were in imminent danger.

20        Q     Is that a no, you didn't make any attempt to get a

21   warrant?

22        A     I did not get any warrant, no.

23        Q     Are you aware of any other police officer who made

24   an attempt to get a warrant?

25        A     Yes.

UNITED STATES DISTRICT COURT

```
 1       Q       Before the entry into the house?

 2       A       Oh, no.

 3       Q       No?

 4       A       Sorry.  I thought you meant pertaining to the case.

 5       Q       Okay.  So what we're talking about is the police --

 6   the police enter the house at about 7:40 in the morning,

 7   correct?

 8       A       Approximately --

 9       Q       I'm sorry -- yeah, about 7:40 in the morning,

10   correct?

11       A       Yes.

12       Q       You have to answer out loud.

13       A       Oh, I said approximately.

14       Q       Approximately?

15       A       Yeah.

16       Q       Okay.  And so before that entry, you're not aware of

17   any police officer obtaining a warrant?

18       A       Correct.

19       Q       You did not possess a warrant?

20       A       I did not possess a warrant.

21       Q       You did not see any other police officer possessing

22   a warrant?

23       A       To my knowledge, there was no warrant attempted

24   prior to us going in there.

25       Q       Okay.  That morning did you arrest Mr. Patrakis?
```

UNITED STATES DISTRICT COURT

65

```
 1      A      Yes.

 2      Q      Was that at about 7:50 in the morning?

 3      A      Approximately.

 4      Q      Where did you locate Mr. Patrakis?

 5      A      In the doorway to his bedroom.

 6      Q      Okay.  Was that the main bedroom?

 7      A      I don't know if it was the main bedroom.  It was

 8 what I believe to be his bedroom.

 9      Q      Okay.

10      A      There was more than one.

11      Q      Okay.  So when you say what you believe to be his

12 bedroom, it appeared that he was residing there, correct?

13      A      Well, yes.

14      Q      And then that is also supported by what you're

15 informed by Ms. Rutowski, that that's where Michael Patrakis

16 resides, correct?

17      A      Correct.

18      Q      Now, you -- when you entered Mr. Patrakis's

19 residence, you had made certain visual observations, correct?

20      A      Correct.

21      Q      And those visual observations were included in your

22 report, correct?

23      A      Yes.

24      Q      And your report eventually is reviewed by

25 Detective Bird, correct?
```

1      A      Yes.

2      Q      And Detective Bird was not at the residence at the

3  time of the initial entry, correct?

4      A      Correct.

5      Q      So any information regarding the police observations

6  were not personal to Detective Bird, correct?

7      A      Correct.

8      Q      Now, once you're back at the station, you said that

9  you had a chance to follow up on some of the information that

10  you were told by Jessie Rutowski; is that right?

11      A      Which -- do you mean prior to the arrest?

12      Q      Yes.

13      A      Correct.

14      Q      So in other words, now you had an opportunity to go

15  look to see if there's any type of theft report?

16      A      Yes.

17      Q      And were you able to find one?

18      A      Yes.

19      Q      Other than a report having been made, did there

20  appear to be any other police activity in regards to that

21  investigation?

22      A      I'm sorry.  Can you explain what you mean by

23  activity?

24      Q      Okay.  In other words, did the police do anything --

25  according to the reports that you were able to review, did the

UNITED STATES DISTRICT COURT

1   police do anything other than accept the report from

2   Mr. Patrakis?

3        A    I think there could have been an APB for the

4   responsible person, but I'm not a hundred percent.

5        Q    You don't know?

6        A    No.

7        Q    Okay.  So other than perhaps an APB, there didn't

8   appear to be any police activity?

9        A    Well, patrol doesn't have access to the narratives

10  of other officers, so I wouldn't be able to read anything other

11  than the face page, the brief synopsis, and APB, stuff like

12  that.  So I just saw the initial synopsis.

13       Q    After meeting with Jessie Rutowski at the -- on the

14  side of the road at about 3:00 in the morning, did you have any

15  further contact with her on the 17th of September?

16       A    I don't recall if I saw her at the station.  I

17  know -- I might have seen her at the station 'cause I worked

18  almost an additional eight hours, and I don't remember if

19  Detective Bird called to the station while I was still there or

20  not.  I might have briefly talked to her.

21       Q    Okay.  But nothing pertaining to the investigation

22  on that day after the 3:00 A.M. meeting?

23       A    I could have briefly talked about the videos with

24  her then.  It might have happened later that day.  It kind of

25  blurs together.  I'm not sure about the chronology.

UNITED STATES DISTRICT COURT

1      Q     Okay.  But for sure you know you met with her on the

2   18th of September?

3      A     Yes.

4      Q     When you met with Ms. Rutowski on the 18th of

5   September, was Detective Bird present?

6      A     I don't -- I don't recall.  I don't remember if she

7   was with Detective Bird when I talked to Detective Bird.

8      Q     You testified -- sorry?

9      A     Sorry.  Detective Bird approached me when I started

10   my shift that day and I don't remember if she was at the

11   station.  I know we met up later at the substation, but I'm

12   talking about the main Kona station where I start my shift.  I

13   don't remember if I spoke to her briefly over there first.

14      Q     So when you are having or working with Ms. Rutowski

15   in terms of downloading additional videos, Detective Bird was

16   not present?

17      A     Correct.

18      Q     You told us earlier that you don't recall whether or

19   not it was pre -- well, was the meeting prearranged, do you

20   recall?

21      A     Yes.

22      Q     It was prearranged?

23      A     Well, by prearranged, if you mean we -- I was told

24   by Detective Bird that she needed to get more information and

25   to meet up with her.  So she planned it with Detective Bird and

 1  regarding me completing what Detective Bird couldn't finish.

 2       Q     Okay.  So Detective Bird had been in contact with

 3  Ms. Rutowski and asked her to meet -- further meet with the

 4  police, correct?

 5       A     With me specifically 'cause I was already familiar

 6  with it.

 7       Q     Okay.  So you're told by Detective Bird that she

 8  would like you to meet with Ms. Rutowski again?

 9       A     To get -- Detective Bird wasn't able to get

10  everything and she had to go home for the day, so I was

11  continuing what she had started.

12       Q     Okay.  So what it seemed like to you is that

13  Detective Bird had met with her, but you were to continue on?

14       A     Yes.

15       Q     And so where are you in terms of working with

16  Ms. Rutowski?

17       A     Oh, where did we view the surveillance?

18       Q     Sorry?

19       A     Where did we view the surveillance?

20       Q     Yes.

21       A     The Captain Cook police station.

22       Q     As opposed to the main Kona police station?

23       A     Just to give a little bit of how the district's laid

24  out, the main Kona station's where we all meet when we start

25  for the day, and mauka and makai is how Kona District is split.

UNITED STATES DISTRICT COURT

1    Since mauka's so far from the main station, the only way we can

2    work on our stuff is at the Captain Cook station.

3         Q      Okay.  The main police station is in Kealakehe,

4    correct?

5         A      Yes.

6         Q      And that's between the Kona Airport and Kona Town,

7    correct?

8         A      Yes.

9         Q      Kailua-Kona.  And Captain Cook is going south up by

10   Konawaena High School, correct?

11        A      Correct, yeah, just south of Konawaena.

12        Q      So you actually meet with Ms. Rutowski at the

13   Captain Cook station?

14        A      Yes.

15        Q      And how do you access the videos or how does she

16   access the videos?

17        A      She didn't have a computer, so I allowed her to use

18   the station computer.  She used the web browser to log into the

19   Dropcam account.

20        Q      Is this in a interview room or at a desk?

21        A      It's a really small substation, so there's only two

22   desks, and it was at one of the desks.  It's kind of one big

23   room, open, where the public comes in, and that's also our work

24   space.

25        Q      And this is a police computer, correct?

1       A       Yes.  It's the ones that are for patrol to do their

2  paperwork.

3       Q       So your assignment at that point is to continue on

4  with the obtaining of videos from Ms. Rutowski because

5  Detective Bird had to leave?

6       A       Yes.

7       Q       So did it appear that they had already been in the

8  process of doing that or did you say, Hey, come to this

9  computer, let's continue taking a look at some of the videos?

10      A       It appeared that they were already done.  They

11 already talked about it, and she just kept -- it was pretty

12 much what happened on the first time I contacted her.  She just

13 wanted to show us all this videos.  So she just took the lead

14 and I was looking at all the videos that she was showing me.

15              She -- she had an idea of which ones she wanted to

16 show me from having viewed it.

17      Q       But your testimony on direct examination was you

18 didn't make a request for her to do it; is that right?

19      A       That's correct.

20      Q       But you asked her if she's willing to continue to do

21 it?

22      A       Correct.

23      Q       All right.  So it was at your invitation?

24      A       Sorry?

25      Q       It was at your invitation?

UNITED STATES DISTRICT COURT

```
 1       A      Was what my invitation?

 2       Q      That she continued to download the videos.

 3       A      Uhm, I was just there to receive what she wanted to

 4   give to me.

 5       Q      But you asked her if it's okay if we continue,

 6   correct?

 7       A      Uhm, I don't even remember if I asked.  She just

 8   wanted to do it.  She came and was eager to --

 9       Q      A continuation of the process, how's that?

10       A      Yeah.  My understanding is that was a continuation

11   of what was already happening.

12       Q      And as a result of her use of the police computers,

13   additional videos were downloaded by you or her?

14       A      She pointed out the videos to me and then I

15   downloaded them 'cause she didn't understand how to download

16   them.

17       Q      So you downloaded the selective videos and then

18   saved them on the CD?

19       A      Yes.

20       Q      And that's the CD that's Exhibit No. 5?

21       A      Exhibit 5, correct.

22       Q      Other than to look up the theft report made by

23   Mr. Patrakis, did you do anything else to corroborate any of

24   the things that Ms. Rutowski had told you about their

25   background and her access to the videos system?
```

1       A       Uhm, I didn't know where Nathan was, so I couldn't

2   talk to him.  He was the person who stole them.  I didn't ask

3   anything of Michael Patrakis 'cause he had been arrested and

4   he's a suspect.  I can't ask him anything.

5               And Jessica -- or sorry -- J.M. was uncooperative,

6   so I couldn't ask anyone else.

7       Q       Okay.  I'm just saying any of the information that

8   Ms. Rutowski tells you about the background between her and

9   Ms. -- Mr. Patrakis, you were unable to -- you didn't do

10  anything more to corroborate it?

11      A       I was -- there was no one to talk to that was

12  willing.

13      Q       So is that no?

14      A       Yes.

15      Q       You didn't do anything?

16      A       Yeah.

17      Q       You were able to view the videos, correct?

18      A       Yes.

19      Q       And they alarmed you, as you said, correct?

20      A       There was many things in them that made me feel

21  concern for the children.

22      Q       Sure.  Did you question to yourself, then, why

23  did -- why would Mr. Patrakis allow this Ms. Rutowski access to

24  the account if that type of information is there?

25      A       Uhm, I really didn't because I saw drug use and a

UNITED STATES DISTRICT COURT

1   lot of times behavior's really unpredictable in drug use, so I

2   didn't know what state of mind he was in when he asked her to

3   look at it.  If I take what she told me, that she's his trusted

4   friend, at face value, it fit, it made sense.

5        Q    So as you said, you took it for face value?

6        A    Yes, I took it for face value.

7             MR. SHIGETOMI:  All right.  I have no other

8   questions, Your Honor.

9             THE COURT:  All right.  Thank you.

10        Ms. Otake, any redirect?

11             MS. OTAKE:  Yes.  Thank you.

12                       REDIRECT EXAMINATION

13   BY MS. OTAKE:

14        Q    Sir, you said that it was a weird time of day for

15   this first contact with Ms. Rutowski.  What did you observe

16   about her that -- well, let me backtrack.

17             Were you concerned at all after meeting her that she

18   might have some of the issues that you said some people have

19   when they make police reports?

20        A    Not at all.  Once I started looking at the videos, I

21   didn't doubt her as I initially did.

22        Q    Okay.  And why did you not doubt her upon looking at

23   the videos?

24        A    Because what she was reporting was accurate.  Most

25   of the time when someone is mentally unstable and they report

1    something, they see stuff that isn't there.  They don't have

2    any way to back up what they're saying.

3              So it was no longer like those circumstances when

4    she had video evidence that she presented me with.

5         Q    Was there anything about her appearance or demeanor

6    that concerned you at all?

7         A    With regard to?

8         Q    To her mental stability, for example.

9         A    No.

10             MS. OTAKE:  If I may have a moment?

11             THE COURT:  Uh-huh.

12             MS. OTAKE:  No further questions, Your Honor.

13             THE COURT:  Okay.  Mr. Foxworthy, thank you.  You're

14   excused as a witness.  Please don't discuss your testimony

15   until after the court rules on this motion.  And I hope you

16   feel better.

17             THE WITNESS:  Thank you, Judge.

18             THE COURT:  Thank you.  Any other witnesses?

19             MS. OTAKE:  Not from the Government, Your Honor.

20             THE COURT:  All right.  Government rests?

21             MS. OTAKE:  Yes, Your Honor.

22             THE COURT:  All right.  Mr. Shigetomi, would you

23   like to call any witnesses or have the court receive any

24   documents into evidence?  Or if you need additional time to

25   speak with your client.

UNITED STATES DISTRICT COURT

1          MR. SHIGETOMI:  I'm ready to proceed, Your Honor.

2          THE COURT:  All right.

3          MR. SHIGETOMI:  Mr. Patrakis would like to testify.

4          THE COURT:  Will he need to handle any documents?

5          MR. SHIGETOMI:  No, Your Honor.

6          THE COURT:  Okay.  So he's sufficient to have his

7    hands handcuffed?  Or, I mean, will it impede in any way in

8    your questioning him?

9          MR. SHIGETOMI:  No, it will not, and it will be very

10   brief.

11         THE COURT:  All right.  Thank you.

12   **MICHAEL PHILLIP PATRAKIS, THE DEFENDANT HEREIN, WAS SWORN**

13         THE COURTROOM MANAGER:  Please be seated.  Stay

14   about three to four -- four inches -- four to five inches from

15   the microphone.

16         Please state your first and last name, and spell your last

17   name for the record.

18         THE WITNESS:  Michael Phillip Patrakis, Patrakis.

19         THE COURT:  Your witness.

20                    DIRECT EXAMINATION

21   BY MR. SHIGETOMI:

22   Q     All right.  Mr. Patrakis, back in September of 2015,

23   where did you reside?

24   A     I reside in Kona, Hawaii, off -- my address was

25   76-6174 Kumu Place.

```
 1      Q      Did you lease that property?

 2      A      I was renting, yes.

 3      Q      Okay.  And was it in your name?

 4      A      Yes.

 5      Q      Was there a Dropcam surveillance system in the

 6  house?

 7      A      Yes, there was.

 8      Q      And whose name was that account under?

 9      A      My own.

10      Q      Anyone else's?

11      A      No, sir.

12      Q      Who set up that account?

13      A      Myself.

14      Q      Did you ever provide your user name to Jessie

15  Rutowski?

16      A      No, I did not.

17      Q      Did you ever provide the password for your user

18  account to Jessie Rutowski?

19      A      No, I did not.

20      Q      Did you give permission to Jessie Rutowski to access

21  your Dropcam surveillance video system at any point?

22      A      No.  I never gave anyone at any point in time any

23  authorization to my account.

24              MR. SHIGETOMI:  I have no other questions, Your

25  Honor.
```

UNITED STATES DISTRICT COURT

1           THE COURT:  All right.  Thank you.

2        Any cross-examination, Ms. Otake?

3           MS. OTAKE:  Yes.

4                      CROSS-EXAMINATION

5    BY MS. OTAKE:

6        Q    Good morning, sir.

7        A    Good morning.

8        Q    Is it true that Nate, also known as Nathan Alu,

9    stole your video cameras?

10       A    Yes.  On September 11th there was an incident with

11   Nate and J.M. at my residence.  He put his hands on her, and

12   while I was at the beach with my kids, he proceeded to assault

13   J.M. and steal from my house.

14       Q    So he stole your video cameras?

15       A    Yes.  More than that, yes.

16       Q    And you made a police report about that?

17       A    Yes, I did.

18       Q    And is it true also that at some point Jessie

19   Rutowski did live with you in that residence?

20       A    Yes, she did.

21       Q    Is it also true that at some point you gave J.M. the

22   password and user name for your Dropcam account?

23       A    No.

24       Q    What is -- is it fair to say that the Dropcam

25   account is a secure website?

UNITED STATES DISTRICT COURT

79

1    A    The Dropcam is not my website.  The Dropcam was my

2  security home surveillance system.

3    Q    But the Dropcam website that has the cloud of

4  information we've been talking about, that -- it requires a

5  password for access, correct?

6    A    Yes, it does.

7    Q    It requires a user name for access, correct?

8    A    Yes, it does.

9    Q    And is it fair to say that it's like most other

10  online services that will require certain types of passwords,

11  symbols, certain number of letters and so on and so forth?

12    A    Yes, it requires a user name and a password.

13    Q    And it's also fair to say then that it would be

14  difficult for anybody to break into a Dropcam account without

15  the user name or password?

16    A    Yes and no.  That's a -- yes and no.

17    Q    I mean, it's meant to be secure?

18    A    Yes.

19    Q    And isn't it fair to say that you were in fact

20  worried about what Nate Alu had seen on those video cameras?

21    A    No.

22    Q    You were aware that at the time that you had been

23  smoking meth in that house and that the video cameras had

24  likely captured that --

25    A    As far as that is concerned, yes, my drug use --

UNITED STATES DISTRICT COURT

```
 1        Q       You were aware of the behavior that the Court has
 2   now heard of and is contained in the exhibits --
 3        A       The only thing I was concerned of was my drug use
 4   and the safety of myself and my two children.
 5        Q       So you were concerned then about the contents of
 6   what was on the video surveillance system?
 7        A       No.
 8        Q       Well, if you're admitting that you were concerned
 9   about your drug use and you know that that would have been on
10   the video surveillance system, among other of your behaviors,
11   isn't it fair to say that you would be concerned about what's
12   on the video surveillance system?
13        A       Yes.
14        Q       Is it also fair to say that back then you were
15   smoking methamphetamine quite frequently?
16        A       Yes, I was using methamphetamine, yes.
17        Q       And that affects memory?
18        A       Excuse me?
19        Q       Methamphetamine affects somebody's memory, does it
20   not?
21        A       Can.
22                MS. OTAKE:  Thank you.  I have no further questions.
23                THE COURT:  All right.  Any redirect?
24                MR. SHIGETOMI:  No, Your Honor.
25                THE COURT:  All right.  Thank you very much.  You're
```

1    excused as a witness, Mr. Patrakis.

2                THE DEFENDANT:  Thank you.

3                THE COURT:  All right.  Any other witnesses or

4    evidence that you'd like to present to the Court?

5                MR. SHIGETOMI:  No, Your Honor.  We rest.

6                THE COURT:  All right.  Thank you.  You rest.  All

7    right.

8         Do counsel wish to make any argument with regard to the

9    motion?

10               MR. SHIGETOMI:  Briefly, Your Honor.

11               THE COURT:  All right.  Please.

12               MR. SHIGETOMI:  Your Honor, the motion that we have

13   filed asserts various grounds.  The first ground is the initial

14   entry into Mr. Patrakis's residence which is uncontroverted was

15   without a warrant.

16        I would also point out that the Officer Foxworthy

17   testified that he was able to meet with Ms. Rutowski at

18   3 o'clock, then sometime at around 4:15 he has the opportunity

19   to contact Child Welfare and that arrangements are made to meet

20   back at the police station at about 6:15, 6:30, and during that

21   time the police had the opportunity to obtain a warrant.

22   Rule 41 of the Hawaii Rules of Penal Procedure, which police

23   were following at that point, allows for telephone warrants as

24   well as duplicate warrants.  I just ask the Court to take

25   judicial notice of that.  They had the opportunity to do that.

1    They chose not to.

2         From the time period of them contacting the Child Welfare

3    to the time that they actually make entry, which is at about

4    7:50 in the morning, they had ample opportunity to obtain a

5    warrant and that they did not.  And our position is is that

6    under those circumstances, because they waited so long to do --

7    take action, it did then turn into exigent circumstances.

8         The visual observations made by the police officer as

9    testified to with Detective Bird were also contained in the

10   affidavit in support of the search warrant 2015-132K, and our

11   position is that is fruit of the poisonous tree in general,

12   that they relied upon that in presenting that to the district

13   judge for the issuance of the search warrant.

14        In regards to the use of the police computers, there were

15   two instances of that, one by Detective Bird, the other by

16   Officers Foxworthy.  It is uncontroverted that it is at the

17   police substation, it is on police equipment, and at that stage

18   she is assisting the government at that point in time

19   regardless of whether there's compensation or not, and so our

20   position is that based upon what Mr. Patrakis has testified to,

21   that he did not give her consent, that that was the use of

22   the -- the police use was -- the police use of this civilian

23   turned into government action because they used government

24   equipment.  So any of those videos, whether it be the CD or the

25   thumb drive, would be subject to suppression.

UNITED STATES DISTRICT COURT

1          Thank you.

2               THE COURT:  Thank you.  Ms. Otake?

3               MS. OTAKE:  Yes, Your Honor.

4          Your Honor, to be clear, I think it's absolutely cemented

5     now that counsel's not challenging the search warrant itself or

6     the products of the search warrant.  In any event, what I'd

7     like to do is focus on the issue of exigency briefly and then

8     turn to the arguments about actual authority.

9          Regarding exigency, Your Honor, the safety of the children

10    was paramount.  That's obvious.  I think you heard the credible

11    testimony of Officer Foxworthy about what he had seen and why

12    it was so important for him to remove this 2-year-old from this

13    home.

14         Even assuming no exigency, however, here on a writ to

15    redact from the search warrant affidavit the observations made

16    during the warrantless entry of the house, there's still ample

17    probable cause for the search warrant.

18         Turning now to the other searches, we've argued from the

19    beginning on page 17 of our brief that there was no search by

20    the government that violated the Fourth Amendment.  The

21    defendant doesn't have a reasonable expectation of privacy and

22    he bears the burden of showing that, and Ninth Circuit case law

23    in the case of *U.S. v. Sarkisian*, 197 F.3d 966 explains that

24    the defendant must show, first, a legitimate expectation of

25    privacy; second, the defendant must manifest a subjective

1    expectation of privacy; and third, the expectation must be one

2    that society would recognize as objectively reasonable.

3        The reality, though, is that he has not met that burden

4    here.  I don't think his testimony, frankly, was credible.  He

5    admitted that he was a drug user back then and that his memory

6    as a drug user is affected.  He admitted that he was, of

7    course, concerned about what was on the videos, and that

8    corroborates what Jessie Rutowski reported.

9        Any search that the -- was done -- let's assume for the

10   moment for the sake of argument that the downloads at the

11   police station and what was contained on the thumb drive did

12   constitute government searches.  Let's assume that for the sake

13   of argument for the moment.  The reality is is that what they

14   obtained did not exceed the scope of what Ms. Rutowski had

15   access to or what she had represented she had access to.

16       And if you look at the case of *United States v. Jacobsen*,

17   46 U.S. 109, and the case of *United States v. Tosti,* 733 F.3d

18   816, what those cases say is where a private party searches an

19   item and then the government goes back and searches the same

20   item and doesn't do any more expansive a search, that that

21   still amounts to a private search.  Using a police computer to

22   do this doesn't change the analysis.

23       So ultimately, because what they accessed was exactly the

24   same thing that Jessie Rutowski had access to, it doesn't

25   change a private search into a government search.  It is -- as

1   long as the scope of the search doesn't exceed what she had

2   access to, then that's not a Fourth Amendment violation.

3        Even if there was a government search, there was ample

4   apparent authority, and I'd like to start off by talking about

5   what seems to be the theme in Mr. Shigetomi's questioning,

6   which was, Well, you didn't vet her enough; you didn't figure

7   out enough about her.

8        But the reality is is that the case law doesn't require

9   any sort of thorough vetting under these circumstances.  The

10  case law requires only three things.  The first, did officers

11  believe some untrue fact that was then used to set the extent

12  of the consent.  In other words, did they in this situation

13  believe the alleged untrue fact that she did not have access to

14  the computer with his authority.

15       Second, was it under circumstances where it was

16  objectively reasonable to believe the fact was true.  And

17  undoubtedly that's the case here.  What happens at the scene

18  and what happens later on are things that are corroborated.

19  She says, Nate Alu's -- Mr. Patrakis told her that Nate Alu

20  stole his video cameras.  It turned out that that was

21  absolutely true.

22       She is motivated by protecting the child.  Both

23  Detective Bird and Officer Foxworthy testified to that, that

24  she seemed very concerned about the 2-year-old, and then what

25  they see in the videos corroborates her concern.  The fact that

1    the videos contain what she describes they're going to contain

2    makes her even more credible.

3         She knew the details of the account.  She knew, for

4    example, that it required a log in and password; she knew that

5    the time frame for maintaining the videos on the Dropcam

6    account was 10 days.

7         And in addition to all this, before Detective Bird met

8    with her, she ran her name through a database and discovered

9    that there was nothing really of interest related to this woman

10   other than perhaps she had been a victim of a crime.

11        So even though vetting is not required, there was some

12   vetting done here, checking on who she was, confirming that

13   what she was reporting was actually shown in the videos.  And

14   the fact that she has the password and user name is an

15   objectively -- it's objectively reasonable to believe that she

16   obtained that from Mr. Patrakis because how else would she

17   obtain that?  And nobody's offered any suggestion that she --

18   as to how she otherwise obtained it.

19        And ultimately assuming the truth of -- the third factor

20   is assuming the truth of the reasonably believed untrue fact,

21   would there have been actual authority.  And that's absolutely

22   true here.  She -- assuming everything she said was true, there

23   would have been actual authority.  He would not have had a

24   reasonable expectation of privacy in his account because he had

25   given somebody, a third party, access to that account.

1          Taking everything together, Your Honor, it's clear that

2     the defendant has not met his burden of showing an

3     unconstitutional search in any fashion.

4          We've also shown that there were ample reasons for the

5     police to believe Jessie Rutowski, and it was more than just

6     based on what she said.  It was based on what they saw, what

7     they knew about her, about her demeanor.  They all represented

8     that there was no reason to disbelieve her, and I think that

9     their testimony was credible and thorough and they acted

10    appropriately in this case.

11         Thank you, Your Honor.

12         THE COURT:  Thank you.  All right.  So, you know, I

13    understand we have Mr. Patrakis here, so this might be a little

14    disjointed, but the court's going to rule from the bench, and

15    then I'm going to follow this up which will be superseded by my

16    reasoned decision.

17         But I do want to first thank the parties for excellent

18    briefing on both sides and very clear and concise.

19         And so the court makes the following findings on four

20    areas:  One, seizure of the video from the Dropcam account and

21    as the basis for the warrantless entry and subsequent search

22    warrant; two, on the warrantless entry and arrest; three, on

23    the search warrant based on observations made during the

24    warrantless entry; and four, on the argument about Ms. Rutowski

25    being an agent of law enforcement.

1          The court respectfully denies the motion to suppress.

2          First, with regard to the seizure of video from the

3    Dropcam account as a basis for warrantless entry and subsequent

4    search warrant, the court finds that Mr. Patrakis had an

5    objectively reasonable and legitimate expectation of privacy

6    for his Dropcam electronic account which contained the videos

7    in issue.  This is because it was password-protected and

8    required an account and user name to access.  This is akin to a

9    locked door and Mr. Patrakis had the key to this door and the

10   lock.

11         This is opposite to the cases involving peer-to-peer file

12   sharing which permits anyone who has downloaded that particular

13   type of account to access it.

14         Secondly, the court finds that the government has

15   demonstrated by a preponderance of the evidence that

16   Ms. Rutowski had permission to access Mr. Patrakis's account

17   based on her representation and because she, in fact, had the

18   user name and password.

19         Thirdly, Ms. Rutowski had actual authority to consent to

20   the search of the Dropcam account because she had mutual use of

21   and access to the videos from her knowledge of the user name

22   and password, given -- which gave her access to the videos.

23   This is akin to giving her, you know, a duplicate key to the

24   locked door and, therefore, law enforcement had third-party

25   consent.

UNITED STATES DISTRICT COURT

 1      Even assuming, however, that Ms. Rutowski falsely stated
 2   that she had Mr. Patrakis's valid permission to access the
 3   account, her representation that she did have valid permission
 4   was not reasonably suspect and it was objectively reasonable
 5   for the police to believe her representation.  Based upon this
 6   reasonable belief that she had actual authority to consent to
 7   the search of the account and the viewing of the video,
 8   Ms. Rutowski would thus have had apparent authority to consent.
 9      Turning to the warrantless entry and arrest, based on the
10   videos viewed by the police, which were shown to them by
11   Ms. Rutowski, there was sufficient evidence of imminent harm to
12   minors to support probable cause for the police to assume
13   protective custody of a child or children without a court
14   order, pursuant to Hawaii Revised Statutes,
15   Section 587A-8(a)(1), and to arrest Mr. Patrakis.
16      With regard to the search warrant based on observations
17   made during the warrantless entry, observations made during the
18   warrantless entry into Mr. Patrakis's home were permissibly
19   used in the search warrant.  The court finds this because the
20   warrantless entry was permissible for the reasons I stated
21   previously and, therefore, any observations made of items or
22   circumstances are permissible under the plain view doctrine.
23      However, even if these observations are excised from the
24   supporting affidavit, the remaining information adequately
25   supports probable cause for the search warrant.  Any evidence

1    seized pursuant to the warrant is, therefore, admissible.

2         With regard to the argument that Ms. Rutowski was an agent

3    of law enforcement and, therefore, any access that she gave law

4    enforcement to the videos was impermissible, the court finds

5    that there was no credible evidence produced supporting a

6    finding that Ms. Rutowski acted as an agent of law enforcement

7    as opposed to a complaining witness presenting evidence of a

8    concern to a citizen that illegal activity has occurred.

9         All right.  As I said, I will put all of this in the

10   reasoned decision, but I know it's of utmost importance to all

11   of you to have the court's decision with regard to that.  And I

12   hope that wasn't too disjointed, but I want to make sure that

13   you folks were aware of the outcome of the motion and the

14   court's findings with regard to the testimony presented.

15        Are there any questions or clarifications?

16             MS. OTAKE:  No, Your Honor.

17             MR. SHIGETOMI:  No, Your Honor.

18             THE COURT:  All right.  So as I said, I'll -- it'll

19   be superseded by the reasoned decision.

20        There being no other matters before the court, we will

21   stand in recess.

22        And, Mr. Patrakis, I'm remanding you back to the custody

23   of the U.S. Marshals Service pursuant to prior detention order.

24   Good day to you, sir.

25        We're in recess.


                    UNITED STATES DISTRICT COURT

1               (Proceedings concluded at 11:27 A.M.)
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT

```
 1                   COURT REPORTER'S CERTIFICATE

 2

 3           I, DEBRA READ, Official Court Reporter, United

 4   States District Court, District of Hawaii, do hereby certify

 5   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 6   true, and correct transcript of the stenographically reported

 7   proceedings held in the above-entitled matter and that the

 8   transcript page format is in conformance with the regulations

 9   of the Judicial Conference of the United States.

10

                     DATED at Honolulu, Hawaii, December 31, 2018.
11

12

13                        /s/ Debra Read

14                   DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT